UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| DAVID A. PICKETT, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | 1:11-cv-0160-SEB-DML |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of the Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**Entry Discussing Complaint for Judicial Review**

David A. Pickett ("Pickett") seeks judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), 42 U.S.C. § 301, *et seq.*

For the reasons explained in this Entry, the Commissioner's decision must be **remanded for further proceedings.**

**I. Background**

Pickett applied for DIB and SSI on March 6, 2006, alleging an onset date of December 5, 2005. His applications were denied initially and upon reconsideration. His request for a hearing before an Administrative Law Judge ("ALJ") was granted, and a hearing was conducted on March 19, 2009. Pickett was present, accompanied by his attorney. Medical and other records were introduced into evidence. Pickett and a vocational expert testified. The ALJ denied Pickett's applications on August 20, 2009. On December 14, 2010, the Appeals Council denied Pickett's request for review, making the ALJ's decision final. *See Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). This action for judicial review of the ALJ's decision followed. The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g), which provides that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . in [a] district court of the United States."

The ALJ's decision included the following findings: (1) Pickett met the insured status requirements of the Act through June 30, 2010; (2) Pickett had not engaged in substantial gainful activity since December 5, 2005, the alleged onset date; (3) although Pickett's mood disorder was not a severe impairment, he had the following severe impairments: human immunodeficiency virus (HIV); avascular necrosis status post bilateral hip replacement and right knee replacement; hepatitis B; and degenerative disc disease; (4) Pickett did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) Pickett had the following residual functioning capacity ("RFC"): he could lift, carry, push, or pull 10 pounds occasionally and five pounds frequently; he could stand and walk two hours in an eight-hour day and sit six hours in an eight-hour work day; he could occasionally perform postural activities such as stooping, balancing, crouching, crawling, kneeling, and climbing stairs or ramps; he should not climb ladders, scaffold, or ropes or work around hazards such as unprotected heights or unguarded, dangerous moving machinery; he should not be subjected to extremes of temperature in the work-place; and his work should be limited to simple, repetitive tasks; (6) Pickett was unable to perform any past relevant work; (7) Pickett was born on October 6, 1960, and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date; (8) Pickett had at least a high school education and was able to communicate in English; (9) transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Pickett was "not disabled," whether or not he had transferable job skills; and (10) considering Pickett's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. With these findings in hand, and through the application of applicable rules and regulations, the ALJ concluded that Pickett had not been under a "disability" as defined in the Act from December 5, 2005, through the date of the ALJ's decision.

## II.   Discussion

### A.  Applicable Law

To be eligible for DIB and SSI, a claimant must prove he is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A); 1382c(a)(3)(A). To establish disability, the plaintiff is required to present medical evidence of an impairment that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms." 20 C.F.R. § 416.908; 404.1508.

> A five-step inquiry outlined in Social Security regulations is used to determine disability status. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005).
>
> > The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520, 416.920. A finding of disability requires an affirmative answer at either step three or step five.
>
> *Id.* The claimant bears the burden of proof at steps one through four, and at step five the burden shifts to the Commissioner. *Id.* at 352.
>
> The task a court faces in a case such as this is not to make a *de novo* determination of the plaintiff's entitlement to benefits, but to decide if the Commissioner's decision was supported by substantial evidence and otherwise is free of legal error. *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993). "Substantial evidence" has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)).

### B. Analysis

In this case, the ALJ concluded that although Pickett had severe impairments consisting of HIV, avascular necrosis status post bilateral hip replacement and right knee replacement, hepatitis B, and degenerative disc disease, there were a significant number of unskilled sedentary jobs in the national economy that he could perform.

Pickett argues that the ALJ's decision is not supported by substantial evidence. Specifically, he argues that the ALJ's determination at step three that his combined impairments did not meet or equal Listings 1.02A (major dysfunction of a joint), 12.04 (affective disorders), or 14.08 (HIV/AIDS) was erroneous because the ALJ failed to build an accurate and logical bridge from the evidence in the record to his determination. Second, he argues that the ALJ's credibility determination was contrary to Social Security Ruling ("SSR") 96-7p. Third, he argues that the ALJ did not take all of his impairments into account when determining that there were some

unskilled sedentary jobs that he could perform.

1. *Listings*

Pickett first argues that substantial evidence does not support the ALJ's step three determination because he met his burden of proof, by medical treatment and examination evidence, that his combined impairments met or equaled all of the criteria in Listings 12.04, 1.02A, and 14.08.

Pickett claims that the ALJ erred in determining that Listing 12.04 (affective disorders) was not met. The ALJ determined that Pickett's mental impairment was not severe, and therefore he did not discuss the requirements of Listing 12.04. Pickett points out that he was diagnosed with major depression and had a three year history of mental illness that included participating in therapy and taking medications. The ALJ discussed Pickett's medical record at his step two determination and noted that in July 2006 Pickett's "diagnoses included a mood disorder due to medical condition with depression and anxiety features . . .." (R. at 17). The ALJ concluded that Pickett's "functional limitations from his mental impairments are so slight" that his mental impairments were not severe. (R. at 18). At step two, the ALJ logically explained his reasoning, using both supporting and contrary evidence in the record, and determined that Pickett's depression did not affect his ability to function more than mildly. (R. at 18-19). In addition, a State Agency medical consultant considered the factors of Listing 12.04 and determined that Pickett's mental impairment did not meet the requirements. (R. at 18, 508-20). For these reasons, the ALJ's decision that Pickett's mental impairment was not severe, and could therefore not meet or equal Listing 12.04, is supported by substantial evidence.

Pickett next argues that his well-documented avascular necrosis related to his HIV, which led to his hip and knee replacements, qualified under Listing 1.02A (major dysfunction of a joint).[1] The ALJ only briefly mentioned Listing 1.02A in his step three determination, stating that

---

[1]Listing 1.02A requires:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).   With:
> A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.02A.

> [t]he claimant's bilateral degenerative joint disease of the hips and knee status post replacement were evaluated using the criteria of Listing 1.02A, but as previously discussed there is no evidence of a resulting inability to ambulate effectively. There is no evidence of gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the knees.

(R. at 19). While the ALJ mentioned the criteria of Listing 1.02A to conclude that it was not met, he failed to support his decision with any citations to medical evidence in the record. In addition, the only things "previously discussed" were Pickett's abilities to function in relation to his mental impairment. There was no previous discussion of ambulation.

The court notes that an imaging report of Pickett's right hip revealed "deformity of the right femoral head," (R. at 385), suggesting gross anatomical deformity. The ALJ erred in finding that there was no gross anatomical deformity in Pickett's lower extremities. (R. at 19). The Commissioner argues, however, that Pickett's inability to ambulate effectively did not last for twelve continuous months as is required by the listing because he recovered well from his hip and knee surgeries. This *post hoc* rationalization is not persuasive. *See Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010)("[t]he government's lawyers who defend denials of disability benefits often rely heavily on evidence not (so far as appears) relied on by the administrative law judge, and defend the tactic by invoking an overbroad conception of harmless error."). Believing the threshold requirement was lacking, the ALJ did not discuss any evidence in relation to the twelve month requirement. Pickett was unable to walk on his own while he was in a nursing home in January 2006 and imaging testing revealed "advanced" avascular necrosis in March 2007. (R. at 383, 385, 640-41). In May 2007, Pickett had right hip replacement and in August 2007, he had a left hip replacement. (R. at 295, 315, 320). In September 2008, he required a total right knee replacement. (R. at 186). The court cannot make a finding in the first instance as to whether Pickett's impairments met or equaled the criteria of Listing 1.02A, however, the ALJ's error is not harmless because we cannot say "with great confidence" that the result would be the same on remand. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). Accordingly, on remand, the ALJ shall reconsider whether Pickett's impairments met or medically equaled Listing 1.02A.

As for Listing 14.08, the ALJ stated only that "in evaluating the claimant's HIV under Listing 14.08, the medical evidence of record does not satisfy the criteria of said Listing." (R. at 19). The ALJ did not discuss any of the criteria of the Listing, nor did he discuss any of the medical evidence that would support his conclusion.

Pickett argues that his impairments met or medically equaled Listings 14.08F and/or 14.08K.

Those subparts of 14.08 require:

14.08 Human immunodeficiency virus (HIV) infection. With documentation as described in 14.00F and one of the following:

F. Conditions of the skin or mucous membranes (other than described in B2, D2, or D3, above), with extensive fungating or ulcerating lesions not responding to treatment (for example, dermatological conditions such as eczema or psoriasis, vulvovaginal or other mucosal *Candida*, condyloma caused by human *Papillomavirus*, genital ulcerative disease).

K. Repeated (as defined in 14.00I3) manifestations of HIV infection, including those listed in 14.08A–J, but without the requisite findings for those listings (for example, carcinoma of the cervix not meeting the criteria in 14.08E, diarrhea not meeting the criteria in 14.08I), or other manifestations (for example, oral hairy leukoplakia, myositis, pancreatitis, hepatitis, peripheral neuropathy, glucose intolerance, muscle weakness, cognitive or other mental limitation) resulting in significant, documented symptoms or signs (for example, severe fatigue, fever, malaise, involuntary weight loss, pain, night sweats, nausea, vomiting, headaches, or insomnia) and one of the following at the marked level:
1. Limitation of activities of daily living.
2. Limitation in maintaining social functioning.
3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 14.08F, K.

Pickett asserts that his thrush in December 2005 and his skin erythema diagnosed on May 16, 2006, qualified under Listing 14.08F because thrush fits the description of the listing and the skin erythema gave him ulcerations under the tongue, a scaling lesion, and a rash on his cheeks and above his eyes. (R. at 614-15, 713). The Commissioner correctly points out that the thrush and the skin condition responded immediately to treatment and Pickett did not complain after they were treated. Because of this, these conditions did not satisfy the requirements of Listing 14.08F. *See James v. Commissioner of Social Sec.*, No. 06-cv-6108 DLI-VVP, 2009 WL 2496485 at *13 (E.D.N.Y. Aug. 14, 2009)(claimant's HIV-related rashes responded well to treatment and therefore did not meet the "not responding" requirement of Listing 14.08F); *Chelte v. Apfel*, 76 F.Supp.2d 104, 108-09 (D. Mass. 1999)(case

remanded to consider Listing 14.08F when ALJ failed to acknowledge evidence of claimant's chronic vulvovaginal candidas). The ALJ's failure to discuss 14.08F was therefore harmless error because Pickett has not pointed to any evidence of "extensive fungating or ulcerating lesions not responding to treatment."

Pickett's stronger argument is that his repeated problems associated with his HIV/AIDS (fatigue, dementia, vertigo, depression, headaches, avascular necrosis) qualified as "repeated manifestations" under 14.08K using an equivalency-type analysis. The Commissioner posits that avascular necrosis is not included in the "repeated manifestations" category and that the other functional requirements of the listing were not met.

The court finds that Pickett's fatigue, dementia, vertigo, depression, headaches, and avascular necrosis could collectively be considered "other manifestations" not specifically mentioned in the listing, or at least medically equal to those listed as examples. In addition, as discussed further below, the ALJ's conclusions as to Pickett's degree of limitations of activities of daily living and in completing tasks in a timely manner were not supported by substantial evidence. The Commissioner's *post hoc* rationalizations do not resurrect the ALJ's one sentence dismissal of Listing 14.08 and failure to discuss subpart K. "[T]he ALJ (not the Commissioner's lawyers) must 'build an accurate and logical bridge from the evidence to [his] conclusion.'" *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (quoting *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001)). Here, the ALJ failed to build an accurate and logical bridge from the evidence to his conclusion that Listing 14.08K was not met or equaled. This did not constitute harmless error because it is not clear to a lay reviewer that the requirements of Listing 14.08K were not met or equaled.

In addition, Pickett contends that the ALJ erred by failing to summon a medical expert to testify whether his combined impairments medically equaled any of the listings. In *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004), the court stated, "as is evident from the perfunctory discussion of the listing, the ALJ never consulted a medical expert regarding whether the listing was equaled. Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." In this case, as in *Barnett*, the ALJ's discussion of Listing 14.08K was perfunctory, he did not consult a medical expert regarding equivalency, and there was no "SSA-831-U5, SSA-832-U5, or SSA-833-U5 form that would otherwise satisfy the ALJ's duty to consider an expert's opinion on medical equivalence."[2] *Id.* at 671; s*ee* S.S.R. 96-6p at 3. While the Commissioner is

---

[2]In this case, forms SSA-831-U3 were in the record, (R. 461-465), but they determined that none of Pickett's impairments were severe, a finding based only on records prior to 2007 and not adopted by the ALJ. (R. at 465). The difference between these forms and a form SSA-831-U5 is unknown. Neither party discussed these forms.

correct in stating that summoning a medical expert is within the ALJ's discretion pursuant to 20 C.F.R. § 404.1527(e)(2)(iii) and 416.927(e)(2)(iii) and that the ALJ ultimately decides if equivalency is met, the ALJ must at least consider the opinion of an expert regarding equivalency. *Barnett*, 381 F.3d at 670. Here, there is no expert opinion on the matter nor is there any discussion of equivalency. On remand, the ALJ shall obtain an expert opinion and reconsider whether Pickett's impairments met or medically equaled Listing 14.08K.

2. *Credibility*

Pickett next argues that the ALJ's credibility determination was patently erroneous because it was contrary to SSR 96-7p. He says that the ALJ mentioned SSR 96-7p, but did not make any accurate findings regarding the seven factors set forth. Pickett's argument goes too far, but the court nonetheless finds that the ALJ's credibility determination is not supported by substantial evidence.

"Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). "The ALJ's credibility determinations are entitled to special deference but the ALJ is still required to build an accurate and logical bridge between the evidence and the result." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). An ALJ must "carefully evaluate all evidence bearing on the severity of pain and give specific reasons for discounting a claimant's testimony about it." *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011).

Pickett asserts that the ALJ should have considered his low Global Assessment of Functioning ("GAF") scores of 45 and 50 for factor 2: the location, duration, frequency, and intensity of pain and other symptoms. In addition, he claims that the ALJ mischaracterized record evidence to minimize the severity of his impairments[3] and ignored evidence of his complaints of fatigue, pain, and migraines.

---

[3] The parties dispute the weight that should be given to GAF scores. The Commissioner contends that the Social Security Administration has declined to endorse GAF scores as dispositive evidence of the severity of a claimant's mental impairments. Pickett argues that his low GAF scores "prove" disability. In this case, one examiner assigned a GAF score of 62 on July 6, 2006. (R. at 17, 529-31). Another treating mental health provider assigned a GAF score of 45 on July 26, 2006. (R. at 548-49, 576-77)(duplicate records). The ALJ discussed the 62 score but did not mention the score of 45. (R. at 17). The ALJ acknowledged the October of 2006 score of 50, but discounted it somewhat by noting that "[w]hile this score falls into the 'serious' range of severity, it is only one point away from only 'moderate" on the GAF scale." *Id.* A low GAF score does not itself prove disability. While it is true that an ALJ is not required to determine the extent of a claimant's disability based entirely on his GAF score, *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), nowhere in the Social Security regulations or case law does it permit an ALJ to ignore a low GAF score while considering other higher GAF scores.

The Commissioner responds that the ALJ's credibility determination was not erroneous because the ALJ considered all of the evidence in the record, including Pickett's testimony, and weighed the evidence appropriately.

Pickett points out that the ALJ used "boilerplate" language when discussing credibility. The ALJ stated:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functioning capacity assessment.

(R. at 21). In *Bjornson*, the Seventh Circuit criticized the phrasing that a claimant's statements were "not credible to the extent that they are inconsistent with the above residual functioning capacity assessment" as "even worse" than the "not entirely credible" language previously criticized in numerous Seventh Circuit cases. *Bjornson*, 671 F.3d at 645. The court determined that this boilerplate implied that an individual's ability to work (meaning the RFC) was determined before his credibility was determined, which is "backwards." *Id.* An ALJ must factor the credibility of a claimant's statements concerning the intensity, persistence and limiting effects of his symptoms into the determination of the claimant's ability to work, not the other way around. *Id.* at 645-46.

Pickett contends that his testimony about his various symptoms was improperly discounted. Pickett testified that, after his knee surgery, he could not work more than four or five hours (and probably could not make it for two hours) because of his fatigue, pain, and migraines. (R. at 898). Pickett further testified that even sitting made him so tired that he had to lie down. (R. at 903). The ALJ acknowledged that Pickett testified that he could not work full-time because of pain, fatigue, vertigo and migraine headaches, (R. at 20), but did not credit these symptoms to the extent alleged.

The ALJ found Pickett's allegations not credible, in part, because he "consistently denied sweats, fatigue, malaise, [and] muscle aches" at his doctor visits, and because the daily activities he described were not as limited as the ALJ would have expected given Pickett's allegations. (R. at 21, 23). While Pickett did deny sweats and malaise consistently and denied fatigue and muscle aches on some occasions, he also specifically complained of fatigue (R. at 401, 542) and muscle aches (R. at 522-23) or was silent at other times. The ALJ believed that Pickett's silence on occasion as to his fatigue and muscle aches supported his finding that there was no

medical evidence in the record supporting Pickett's claims. (R. at 22). But, "allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p at 6; *Bjornson,* 671 F.3d at 646. This is especially important when discussing an impairment such as AIDS, where fatigue can be a chronic, everyday occurrence and is therefore possibly underreported. (R. at 401, treating physician noting that fatigue "is a common problem with patients with AIDS"); s*ee Bragdon v. Abbott*, 524 U.S. 624, 636 (describing general systemic symptoms of HIV). Similarly, Pickett consistently reported pain and testified that pain was a major reason that he could not work full time. The ALJ did not credit such allegations because "the record is devoid of any contemporaneous documentation of his allegations of disabling physical pain and limitations at the frequency and severity he alleges." (R. at 22). The court cannot trace the ALJ's reasoning in this regard. In fact, the record is replete with Pickett's reports of chronic severe pain. *See e.g.,* (R. at 385 (back and lower leg pain), 386 (leg pain), 388 (pain and severe weakness in both legs), 389 (pain in right hip), 522 (muscle and joint pain in legs, feet, ankles, calves, and thighs), 542 (overwhelming fatigue and muscle aches), 590 (dizziness for a month, sharp pain in right leg), 591 (numbness when sitting for a long time, dizziness), 601 (constant severe left leg pain)).[4]

As for the contention that Pickett's daily activities were not as limited as they should have been given his allegations of pain, fatigue, migraines, and weakness, the ALJ mentioned that Pickett's usual daily activities consisted of showering, watching television and walking to bingo. (R. at 18). The ALJ also noted that Pickett could make his bed, cook, dust, do laundry, grocery shop, and do yard work, but at a slower pace. *Id.* Although Pickett was able to do these particular activities, the ALJ failed to acknowledge that there are "critical differences between activities of daily living and activities in a full-time job," such as flexibility in scheduling, availability of help, and performance standards (such as pace). *Bjornson,* 671 F.3d at 647. The ability to do some minimal daily activities at a slow pace certainly does not translate to an ability to work full time. *See Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004) (ALJ "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week"). The activities described were sporadic and do not support a finding that Pickett could work on a regular and continuing basis 40 hours a week. The ALJ's evaluation of Pickett's daily activities with regard to his credibility assessment is not supported by substantial evidence.

---

[4] In addition, the ALJ's statement that Pickett "ambulated without an assistive device, drives, and was working" in September of 2008, was inaccurate. (R. at 22, citing R. at 414). These functions were reported as Pickett's "premorbid level of function." The report, in fact, listed Pickett's "current functional level" as severely limited. ("ambulates 60 feet with a standard walker, transfers from sit to stand with supervision.") (R. at 414).

For the reasons set forth above, the ALJ's credibility determination, especially in relation to Pickett's complaints of pain and fatigue and daily activities, is not supported by substantial evidence and shall be reconsidered on remand.

### 3. *Steps Four and Five*

Pickett last argues that substantial evidence fails to support the ALJ's RFC assessment that Pickett could perform some unskilled, sedentary jobs. Pickett claims that the RFC assessment omitted his depression limitations and disregarded the severity of his pain and fatigue. In addition, although the ALJ stated that "[t]he record fails to support any limitations on his sitting," (R. at 22), there is evidence in the medical record that Pickett complained of numbness in his legs when he sat for long periods of time (R. at 591) and that even sitting made him tired. (R. at 903).

"Hypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). The vocational expert testified that there would be no jobs in the national economy for a person who was as limited as Pickett testified he was. (R. at 916).

On remand, if Pickett's impairments are not found to meet or equal a listing, the ALJ will be re-evaluating Pickett's credibility. Any changes in his credibility determination shall be incorporated in his RFC determination and in the hypothetical questions posed to the vocational expert.

## III.  Conclusion

For the foregoing reasons, the ALJ's determination that Pickett was not disabled is not supported by substantial evidence in some respects discussed above. The case is **remanded** to the ALJ for further consideration. *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991) (a court may remand the case after passing on its merits and issuing a judgment affirming, modifying, or reversing the Commissioner's decision, a "sentence four" remand). On remand, consistent with this Entry, the ALJ should reconsider whether Listings 1.02A and 14.08K were met or equaled, reassess Pickett's credibility, and factor any changes into his RFC determination and hypothetical question at steps 4 and 5.

**IT IS SO ORDERED.**

Date:  09/27/2012

*[signature: Sarah Evans Barker]*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

**Distribution:**

**Thomas E. Kieper**
**UNITED STATES ATTORNEY'S OFFICE**
**tom.kieper@usdoj.gov**

**Patrick Harold Mulvany**
**patrick@mulvanylaw.com**